UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANFORD WASHINGTON,<br>      Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>      Defendant. | Case # 1:18-cv-700-DB<br><br>MEMORANDUM DECISION<br>AND ORDER |

## INTRODUCTION

Plaintiff Stanford Washington ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act, and his application for Supplemental Security Income ("SSI") under Title XVI. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned, in accordance with a standing order (*see* ECF. No. 15).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 12. Plaintiff also filed a reply. *See* ECF No. 13. For the reasons set forth below, the Commissioner's motion (ECF No. 12) is **DENIED**, and Plaintiff's motion (ECF No. 9) is **GRANTED IN PART**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings as set forth below.

## BACKGROUND

On March 16, 2015, Plaintiff protectively filed his DIB and SSI applications, alleging a disability beginning on March 13, 2015 (the disability onset date), due to: (1) broken shoulder; (2) shattered elbow; (3) pain in shoulder; (4) pain in elbow; (5) trouble sleeping due to pain; and (6)

high blood pressure. Transcript ("Tr.") 203. Plaintiff's claim was initially denied on June 4, 2015 (Tr. 82-85), after which he requested an administrative hearing (Tr. 35-65). Plaintiff's hearing was held on May 4, 2017. Tr. 12-30. Administrative Law Judge Elizabeth Ebner (the "ALJ") presided over the hearing via video from Falls Church, Virginia. Tr. 53, 55. Plaintiff appeared and testified from Buffalo, New York, and was represented by Kelly Laga-Sciandra, an attorney. *Id*. Bernard M. Preston, an impartial vocational expert ("VE") also appeared and testified at the hearing. *Id*.

The ALJ issued a partially favorable decision on May 23, 2017, finding that Plaintiff was not disabled prior to June 2016, but he was disabled after that date. Tr. 12-30. On April 27, 2018, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## **ADMINISTRATIVE LAW JUDGE'S FINDINGS**

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her May 23, 2017 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2015;

2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 et seq., and 416.971 *et seq.*);

3. Since the alleged onset date of disability, March 13, 2015, the claimant has had the following severe impairments: History of left humerus and olecranon fractures status-post open reduction internal fixation surgery; congestive heart failure; hypertension; hyperlipidemia (20 CFR 404.1520(c) and 416.920(c));

4. Since the alleged onset date of disability, March 13, 2015, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5. Prior to June 1, 2016, the date the claimant became disabled, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c).[1] However, he could only occasionally reach overhead, but could frequently reach in all other directions, handle, finger, and operate hand controls. He could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or dangerous moving mechanical parts. He was further limited to only occasional exposure to humidity, wetness, extremes of heat and cold, vibrations, and dusts, fumes, odors, and other pulmonary irritants;

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he or she is determined to also be able to do sedentary and light work. 20 CFR 416.967(c).

6. Beginning on June 1, 2016, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).[2] He continued to be limited to only occasionally reaching overhead, and frequently reaching in all other directions, handling, fingering, and operating hand controls. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, or scaffolds or be exposed to unprotected heights or dangerous moving mechanical parts. He is further limited to only occasional exposure to humidity, wetness, extremes of heat and cold, vibrations, and dusts, fumes, odors, and other pulmonary irritants. Additionally, the claimant would be off-task for up to thirty percent of an eight-hour workday in addition to normal breaks;

7. Prior to June 1, 2016, the claimant was capable of performing past relevant work as a Produce Packer. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965);

8. Beginning on June 1, 2016, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work (20 CFR 404.1565 and 416.965);

9. The claimant was an individual of advanced age on June 1, 2016, the established disability onset date (20 CFR 404.1563 and 416.963);

10. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

11. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968);

12. Since June 1, 2016, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966);

13. The claimant was not disabled prior to June 1, 2016, (20 CFR 404.1520(1) and 416.920(f)) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g));

14. The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2015, the date last insured (20 CFR 404.315(a) and 404.320(b)).

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Tr. at 12-30.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on March 16, 2015, Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through September 30, 2015, the last date insured. *Id.* at 30. The ALJ also determined, based on the application for supplemental security income protectively filed on March 16, 2015, Plaintiff has been disabled under section 1614(a)(3)(A) of the Social Security Act beginning on June 1, 2016.

## **ANALYSIS**

Plaintiff argues that the ALJ's decision could not be based on substantial evidence because there was no medical opinion supporting her assessment, and that she improperly used raw medical data to determine when Plaintiff became disabled. *See* ECF No. 9-1 at 10-15. The Commissioner responds that substantial evidence supported the ALJ's assessment that Plaintiff could perform limited medium level work with limited reaching, especially overhead reaching, and became disabled in June 2016, due to his heart condition worsening. *See* ECF No. 12-1 at 14.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Plaintiff fractured his left arm and elbow when he fell ten to fifteen feet from a ladder while working on a gutter. Tr. 259. He presented to the emergency room at Erie County Medical Center ("ECMC") (Tr. 328) and was hospitalized for three days between March 13 and March 16, 2015.

6

Orthopedic surgeon Christopher Ritter, M.D. ("Dr. Ritter") performed open reduction internal fixation ("ORIF") surgery on Plaintiff's left elbow and shoulder. Tr. 290, 263-64, 326. An echocardiogram performed during Plaintiff's pre-surgical screening examination demonstrated left ventricular hypertrophy with an ejection fraction between 40 and 45 percent, resulting in a diagnosis of grade II congestive heart failure ("CHF") for which he was prescribed hypertension medication. Tr. 293-94, 334-35. During his hospitalization, he had acute blood loss anemia requiring a one-unit blood transfusion, and he was prescribed a 30-day course of iron and vitamin C. Tr. 293-94. Plaintiff was discharged on March 16, 2015. Tr. 268. On June 1, 2015, Plaintiff had x-rays of his left shoulder and elbow that showed healing fractures, intact hardware and positioning, and an overall successful surgical outcome. Tr. 284-85.

Plaintiff was seen by consultative examiner Hongbiao Liu, M.D. ("Dr. Liu"), in May 2015, approximately two months after his surgery. Tr. 277-80. Plaintiff reported that he had been attending therapy twice per week since his surgery. Tr. 277. He also reported constant ongoing left-upper-extremity pain that he rated as a 6/10, with symptoms of numbness and tingling. Tr. 277. Plaintiff had reduced range of motion of his left shoulder and elbow, as well as slightly reduced 4/5 strength; he had no atrophy; 5/5 grip strength in both his left and right hands, and intact hand and finger dexterity. Tr. 279. His joints were stable and nontender, without subluxations, contractures, ankylosis, thickening, redness, heat, swelling or effusion. *Id*. He had physiologic and equal deep tendon reflexes in his upper and lower extremities without sensory deficits, and 5/5 strength in his right upper extremity and bilateral lower extremities. *Id*. Despite his injuries, Plaintiff told Dr. Liu that he cooked occasionally, showered and dressed daily, and enjoyed reading books and socializing with friends. Tr. 277.

From a cardiovascular perspective, Dr. Liu found Plaintiff had a regular heart rate and rhythm without murmurs, gallops, or rubs, no cyanosis, clubbing, or edema, physiologic and equal pulses, and no significant varicosities or trophic changes. Tr. 278-79. He had elevated blood pressure on examination and was instructed to follow up with his primary care physician. Tr. 278. Dr. Liu diagnosed Plaintiff with hypertension and a "left shoulder and elbow injury," assessed him with a "stable" prognosis, and opined that he had moderate limitations for lifting, carrying, and overhead reaching. Tr. 279-80. However, Dr. Liu further stated that Plaintiff needed to be reevaluated after he recovered from his injury to assess his baseline functioning. Tr. 280. Plaintiff gave Dr. Liu's opinion "some weight," finding Dr. Liu's opinion that Plaintiff had moderate limitations for lifting, carrying and overhead reaching (Tr. 279) inconsistent with other evidence in the record. Tr. 25. As the ALJ explained, Dr. Liu's opinions are relevant insofar as they describe Plaintiff's functioning just two months after surgery, The report did not assess Plaintiff's "prospective functioning," and subsequent records show that Plaintiff's arm continued to heal and improve. *Id*.

In July 2015, Plaintiff presented to his primary care provider Vincent Lee, M.D. ("Dr. Lee"). Tr. 394. At that time, Dr. Lee noted that Plaintiff's hypertension was stable, and he was "doing well with his heart failure symptoms" and was "currently asymptomatic." Tr. 394. Plaintiff denied headaches, chest pain or discomfort, dyspnea, shortness of breath, wheezing, edema, fatigue, exercise intolerance, orthopnea, or focal neurologic deficits. *Id*. Dr. Lee noted some abnormalities in Plaintiff's heart auscultation, but he did not have edema or varicosities. Tr. 396. No mention was made of his previous fractures or related symptoms, and he had a normal gait and strength with normal muscle tone and no signs of atrophy. Tr. 394-97.

Several weeks later, on July 27, 2015, Plaintiff followed up with the ECMC Orthopedic Clinic. Tr. 336. He reported persistent 7/10 left-upper-extremity pain after having run out of his pain medications two weeks before. *Id*. His left shoulder range of motion was limited by pain, and he could not raise his arm above his head. *Id*. He also reported pain, tingling, and numbness, but had largely intact range of motion of his left elbow. *Id*. Plaintiff was referred to physical therapy to improve his range of motion and given one refill of pain medication, but he was told no further refills would be provided going forward. *Id*.

In October 2015, Plaintiff returned to the ECMC Orthopedic Clinic with ongoing 6/10 pain. Tr. 336-41. He reported that he had completed physical therapy and continued to have tenderness in his left shoulder and elbow; however, he had attained 70 percent of full range of motion of his shoulder and was continuing to do range of motion exercises at home. Tr. 339. Plaintiff's left shoulder was tender to palpation diffusely over the left shoulder and range of motion was limited due to pain, active and passive with no deformity. Tr. 336. Imaging of his elbow and shoulder continued to demonstrate progressively healing fractures with intact hardware and positioning. Tr. 337-38, 340-41. Although his blood pressure was significantly elevated, he denied any chest pain or shortness of breath. Tr. 339. He was prescribed tramadol and cleared to participate in normal activities with "no restrictions." Tr. 339.

Plaintiff continued to treat with Dr. Lee for hypertension and CHF. In November 2015, Dr. Lee noted that Plaintiff was "doing poorly" with his hypertension control, with his blood pressure again characterized as "uncontrolled," but he was doing well with his hyperlipidemia goals. Tr. 386, 389. He reported "occasional dizziness," but he denied headache, chest pain or discomfort, dyspnea, shortness of breath, edema, exercise intolerance, syncope, orthopnea, weakness, fatigue, palpitations, or focal neurologic deficits. Tr. 386. Dr. Lee increased Plaintiff's hypertension

9

medication and stated his CHF remained "asymptomatic." Tr. 389. During the visit, Plaintiff also complained of elbow pain, but denied swelling, clicking, catching, locking, or wrist pain. Tr. 386. On examination, he had some reduced left-shoulder range of motion and point tenderness, but normal strength without swelling, erythema, atrophy, or warmth. Tr. 388-89.

In May 2016, Plaintiff returned to his primary care provider complaining of ongoing 7/10 left-shoulder and elbow pain. Tr. 381. Plaintiff again denied swelling, clicking, or catching, and continued to have "normal strength throughout" without atrophy despite some ongoing reduced range of motion due to pain "especially on abduction." Tr. 383. However, inspection/palpitation of joints, muscles, and bones was noted as abnormal. *Id*. Dr. Lee noted "no limitations on internal rotation or external rotation" and again referred Plaintiff to physical therapy. Tr. 383-84. Plaintiff's hypertension remained elevated, but he had not taken his blood pressure medications for several weeks. Tr. 381, 384. He continued to deny hypertension symptoms, and Dr. Lee described Plaintiff's CHF as stable and asymptomatic. Tr. 381, 383-84.

At the end of May 2016, Plaintiff attended a single occupational therapy session for left elbow pain. Tr. 375-80. Despite being cleared by his orthopedic specialist at ECMC to return to normal activities with "no restrictions" in October 2015 (Tr. 339), Plaintiff told the occupational therapist that he did not feel he could return to work due to the loss of motion in his left arm (Tr. 376). He indicated that he could complete simple home care tasks but had to take breaks due to pain, and he claimed that his lifting abilities were reduced. Tr. 376. The therapist noted that Plaintiff's left grip and pinch strength were significantly weakened and opined he was "60-70% impaired to complete tasks." Tr. 379. The record indicates that Plaintiff did not return for further treatment after this initial evaluation (Tr. 375-80), and subsequent records do not reflect any further treatment for left upper extremity symptoms.

As noted above, Plaintiff consistently reported problems with his left shoulder/elbow, even after surgery. The Court finds that there is merit to Plaintiff's argument that the RFC with respect to his shoulder complaints necessitates a remand. Accordingly, the Court finds that the ALJ should base her RFC on medical evidence—by a consultative exam, if necessary. However, as explained below, the ALJ was correct in her assessment of Plaintiff's heart condition.

In June 2016, Plaintiff's heart condition worsened. In October 2016, Tenzin Arya, M.D. ("Dr. Arya"), noted that Plaintiff had another echocardiogram in June 2016 that showed worsening of his CHF, and his left ventricular ejection fraction had dropped to between 30 and 35 percent. Tr. 367. Although Plaintiff reported that he experienced chest pain with strenuous exertion, such as playing pickup basketball games, he had minimal shortness of breath and the chest pain was relieved with rest. Tr. 367. A stress test in November 2016 showed no evidence of myocardial ischemia or infarct and temporary improvement in his left ventricular ejection fraction, which was measured at 47 percent at that time; however, this subsequently fell to 30 to 35 percent with additional testing. Tr. 361.

In November 2016, Plaintiff saw Physician Assistant ("PA") Pia Musielak ("PA Musielak"), for "cardiovascular evaluation regarding cardiopathy myopathy." Tr. 361-64. PA Musielak noted that Plaintiff had not experienced any recent symptoms of CHF and he was taking a beta blocker and angiotensin receptor blocker. Tr. 361. Plaintiff denied any chest pain or discomfort, palpitations, or dyspnea, but said he sometimes experienced dizziness when transitioning from a sitting to standing position. Tr. 363. His blood pressure was controlled at that time, and he was diagnosed with dilated cardiomyopathy that was "nonischemic and likely hypertensive in origin." Tr. 364. In March 2017, Plaintiff reported shortness of breath, headaches, and lightheadedness, and continued to have uncontrolled blood pressure. Tr. 358-60. Further

testing showed that his left ventricular ejection fraction had again fallen to between 30 and 35 percent, which his cardiologist characterized as "persistent, severe" left ventricular dysfunction. Tr. 360. A prophylactic ICD (implantable cardioverter-defibrillator) was recommended "for the prevention of sudden cardiac death," which Plaintiff declined. Tr. 360.

Plaintiff argues the ALJ relied on her lay interpretation of raw medical data in making her decision, and, therefore, her decision was not supported by substantial evidence. *See* ECF No 9-1 at 10. However, as discussed further below, substantial evidence supported the ALJ's determination that Plaintiff could perform limited medium level work with limitations notwithstanding his heart condition before becoming disabled in June 2016, due to his heart condition worsening. Plaintiff further argues that the decision could not be based on substantial evidence because there was no medical opinion specifically supporting the ALJ's decision. *Id*. at 10, 12. This argument fails.

It is Plaintiff's burden to show he is disabled, not the Commissioner's burden to show that he is not. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating by reference 42 U.S.C. § 423(d)(5)(A)); 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are . . . disabled."); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (it is Plaintiff's burden to establish that she is disabled); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that he cannot perform the RFC as found by the ALJ). The ALJ has the responsibility to determine a claimant's RFC, based on all of the relevant medical and other evidence in the record. *See id*. §§ 404.1527(d)(2), 404.1545(a), 404.1546(c); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (the ultimate responsibility to determine a

claimant's residual functional capacity rests solely with the ALJ); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (unpublished) (summary order) (formal medical opinion as to plaintiff's functionality was not required where the record contained sufficient evidence from which the ALJ could assess the residual functional capacity).

Furthermore, a decision can be supported by substantial evidence without any opinions. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. Apr. 2, 2013) (unpublished) (Where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity," a medical source statement or formal medical opinion is not necessarily required.); *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (unpublished) (the residual functional capacity need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render a residual functional capacity finding consistent with the record as a whole) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). This does not equate with the ALJ relying on a "lay opinion" to interpret medical data when making a residual functional capacity finding; *Johnson v. Colvin*, 669 F. App'x 44, 46-47 (2d Cir. 2016) (citing 20 C.F.R. § 416.945(a)(3) (explaining that an ALJ looks to "all of the relevant medical and other evidence" including relevant medical reports, medical history, and statements from the claimant when assessing an applicant's residual functional capacity); *Rosa*, 168 F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.").

Here, the medical records sufficiently documented Plaintiff's functional abilities through clinical findings consistent with the RFC, and evidence that Plaintiff's heart condition was

asymptomatic prior to June 2016. The opinion also supported the finding that Plaintiff was not suffering functional limitations related to his heart condition prior to June 2016.

Dr. Lee opined that Plaintiff was asymptomatic in July 2015, November 2015 and May 2016. Tr. 381, 383-84, 389, 394. Although Plaintiff points to the ALJ's consideration of ejection fraction percentages without a medical opinion to interpret the results (*see* ECF No. 9-1 at 13-15), the ALJ did not rely solely on such ejection fraction percentages in her assessment of Plaintiff's functional limitations related to his heart condition. The record contained significant evidence that Plaintiff had no functional limitations related to his heart condition prior to June 2016. While an echocardiogram showed that Plaintiff had reduced function in his heart, an ejection fraction between 40 and 45 percent, he had an otherwise normal cardiovascular examination. Tr. 293. Plaintiff reported no functional loss or any symptoms and denied any chest pain or shortness of breath. Tr. 292. The ALJ noted and properly considered all these clinical findings in determining Plaintiff's RFC. Tr. 42; *see Hall v. Astrue*, 677 F.Supp.2d 617, 630 (W.D.N.Y. 2009) (finding that a claimant's testimony as to subjective complaints is entitled to great weight only when consistent with and supported by objective medical evidence). Since the ALJ had ample evidence supporting her conclusions regarding Plaintiff's cardiovascular limitations, a specific medical opinion matching the RFC was not required to constitute substantial evidence.

Plaintiff contends remand is warranted for the ALJ to develop the record by ordering a medical opinion. *See* ECF No. 9-1 at 14-15. The Court agrees but only as to Plaintiff's shoulder and elbow complaints. Otherwise the Court finds no error in the ALJ's opinion.

## **CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **GRANTED IN PART**, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 12) is **DENIED**, and this

matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000). On remand, the Commissioner is directed to formulate an RFC respect with respect to Plaintiff's shoulder complaints on medical evidence—by a consultative exam, if necessary.

    **IT IS SO ORDERED**.

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE